IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KELLY ANN LINDSEY, | ) | CASE NO. 1:16-cv-02728 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Kelly Ann Lindsey ("Plaintiff" or "Lindsey") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits

("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has

been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to

Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that the Court

**AFFIRM** the Commissioner's decision.

## I. Procedural History

### A.     Prior applications

Prior to the filing of the DIB and SSI applications at issue in this appeal ("current

applications"), Lindsey filed applications for DIB and SSI on November 2, 2011, alleging

disability beginning on September 1, 2009.  Tr. 12.  On November 27, 2013, an Administrative

Law Judge issued an unfavorable disability decision.  Tr. 12, 92-110.

**B.      Current applications**

Lindsey protectively filed applications for DIB and SSI on February 7, 2014.[1]  Tr. 12,

111, 141, 246-251, 252-261, 262-268, 269-274.    She alleged a disability onset date of

November 28, 2013 (Tr. 12, 111, 141, 246, 253, 291), and alleged disability due to panic

disorder, agoraphobia, spinal injury, depression, anxiety, affective disorder, diabetic neuropathy,

bone spur in left hip, back and neck pain, memory loss, tendinitis in left shoulder and elbow,

diabetes, and blood clots (Tr. 111-112, 141-142, 171, 189, 295).   After initial denial by the state

agency (Tr.  171-179, 180-186) and denial upon reconsideration (Tr. 189-195, 196-200), Lindsey

requested a hearing (Tr. 202-203).  A hearing was held before Administrative Law Judge Scott

R. Canfield ("ALJ") on February 11, 2015.  Tr. 30-80.   Lindsey alleged that her condition had

worsened since the issuance of the November 27, 2013, decision.  Tr. 18, 334-335.

In his February 3, 2016, decision (Tr. 9-29), the ALJ determined that Lindsey had not

been under a disability from November 28, 2013, through the date of the decision (Tr. 23).   In

reaching his decision, the ALJ recognized that there was new and additional evidence since the

prior November 27, 2013, decision but concluded that "the new and additional evidence [did] not

provide a basis for a different finding of the claimant's functional limitations.  Therefore, the

[ALJ] . . . incorporated the findings regarding . . . [Lindsey's] functional limitations from the

November 27, 2017, unfavorable decision into . . . [his] decision."  Tr. 12-13; *see also* Tr. 20.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 9/21/2017).

Lindsey requested review of the ALJ's decision by the Appeals Council. Tr. 7-8. On September 22, 2016, the Appeals Council denied Lindsey's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-6.

## II. Evidence

### A. Personal, educational, and vocational evidence

Lindsey was born in 1967. Tr. 35. Lindsey lived with her 72 year old mother. Tr. 35, 42. She completed school through the 11th grade. Tr. 36. Lindsey worked in the past as a caregiver in a small group home, providing personal services for the residents in the home. Tr. 60-61.

### B. Medical evidence

#### 1. Treatment records

In November 2013, Lindsey saw her primary care physician Dr. Kelly K. O'Malia, M.D., for her diabetes. Tr. 414-419. Lindsey's blood sugars were high and she reported that she had been unable to get her insulin from patient assistance. Tr. 414. On examination, Dr. O'Malia observed normal range of motion in the cervical spine with mild pain, 5/5 strength proximally and distally, and sensation to light touch was intact in all nerve distributions in the bilateral upper extremities. Tr. 415. Lindsey's mood and affect were normal. Tr. 416. Dr. O'Malia instructed Lindsey to start Lantus and Humalog before each meal. Tr. 416. Also, Lindsey was instructed to call in her blood sugars every 3-4 days and schedule a diabetic eye exam. Tr. 416. Lindsey was to continue taking metformin, glyburide, and Coumadin.[2] Tr. 416. Also, for her cervical radicular pain, Lindsey was to start taking Lyrica. Tr. 416.

---

[2] Treatment notes reflect a diagnosis of anticoagulated on Coumadin. Tr. 416.

On February 3, 2014, Lindsey saw Dr. O'Malia. Tr. 405-413. Lindsey's complaints included neck and back pain. Tr. 405. Lindsey was checking her blood sugars variably – she obtained some strips from her mother and sister. Tr. 405. Lindsey reported that she now had insurance and would like a prescription for her own glucometer. Tr. 405. Lindsey indicated that her neck pain radiated down her arms, more on the left than right, and she had paresthesias in her arms. Tr. 405. Lindsey was taking Lyrica only at night and only as needed. Tr. 405. The Lyrica helped but it was making her tired when taken during the day. Tr. 405. Lindsey reported that her low back pain was chronic; it was not radiating down her legs; she had no weakness in her legs but she was having paresthesias in her legs that was below her knees and in her feet mainly; and her legs fell asleep if she crossed them. Tr. 406. On examination, Dr. O'Malia observed normal range of motion in the neck and back with minimal pain in the neck, 5/5 strength in the upper and lower extremities, sensation to light touch intact in upper and lower extremities, negative straight leg raise test bilaterally, and mild tenderness to palpation in the lumbosacral spine and lumbosacral paraspinal areas. Tr. 407. Lindsey's mood and affect were normal. Tr. 407. Dr. O'Malia continued Lindsey on her diabetic mediation. Tr. 407. Dr. O'Malia switched Lindsey from Lyrica to Gabapentin for treatment of her radicular pain and low back pain because Lindsey reported side-effects from the Lyrica. Tr. 407-408. Dr. O'Malia also recommended that Lindsey consult with physical therapy. Tr. 407. Dr. O'Malia also diagnosed diabetic neuropathy and noted that the Gabapentin should help with that condition as well. Tr. 408. Lindsey was also instructed to continue to take Coumadin at a decreased dose. Tr. 407.

At the end of February 2014, Lindsey saw physical therapist Jennifer Diehl for a functional capacity evaluation. Tr. 462-467. Ms. Diehl recommended physical therapy. Tr. 467.[3]

On March 6, 2014, Lindsey saw Dr. O'Malia to discuss her Coumadin regime, her left knee and hip pain and her anxiety. Tr. 396-404. Lindsey reported having left knee pain for about four weeks. Tr. 396. She reported having left hip pain for about two weeks with the pain becoming worse after the functional capacity evaluation. Tr. 396. Lindsey also reported that she had been having panic attacks. Tr. 397. She relayed that she recently lost guardianship of her handicapped adult son to the state and he was now in an extended care facility and she had limited visitation with him. Tr. 397. Lindsey requested a referral to Signature Health where she had been seen before. Tr. 397. On examination of Lindsey's left hip, Dr. O'Malia observed no limp, ability to bear weight without pain, normal strength of hip muscles, normal sensation and pulses, normal range of motion without pain, and mild tenderness over the lateral trochanteric area. Tr. 398. With respect to Lindsey's left knee, Dr. O'Malia observed very minimal effusion, ability to bear weight without difficulty, normal strength and sensation, mild pain along the medial joint line during testing and mild tenderness to palpation of the medial joint line and patella. Tr. 398. Lindsey's mood was dysthymic and slightly anxious and her affect was mildly blunted and tearful at times. Tr. 398. An x-ray taken of Lindsey's hips showed minimal osteoarthritis of both hips. Tr. 402. An x-ray of Lindsey's left knee was negative. Tr. 403. Dr. O'Malia made some adjustments to Lindsey's Coumadin, Lantus and Humalog. Tr. 398-399. She recommended physical therapy for Lindsey's left hip and knee pain, provided Lindsey a prescription for a knee brace, and advised Lindsey that she could return for a corticosteroid

---

[3] The details of Ms. Diehl's findings are summarized below in the opinion section.

injection for her knee. Tr. 399. Dr. O'Malia also advised Lindsey to consult with psychiatry for her anxiety. Tr. 399.

Upon Dr. O'Malia's referral, Lindsey started physical therapy at Drayer Physical Therapy Institute on March 11, 2014. Tr. 518-548. She attended nine sessions, cancelled eight sessions, and was a no show for two sessions. Tr. 518. At the end of April 2014, Lindsey was discharged from physical therapy because "[Lindsey] was very non-compliant." Tr. 518.

On April 6, 2014, Lindsey went to the emergency room because her blood sugar had dropped. Tr. 624-626. She was diagnosed with low blood sugar and discharged that same day. Tr. 624. Lindsey was also seen at the emergency room on April 16, 2014, for complaints of chest pain, dizziness, spinning sensation, ringing in her ears, nausea and mild sweating. Tr. 617-622. An electrocardiogram showed normal sinus rhythm and a chest x-ray was unremarkable. Tr. 618. The emergency room assessment was nonspecific chest pain and vertigo and Lindsey was discharged home with medication. Tr. 618-619.

On June 29, 2011, Lindsey went to the emergency room with complaints of left leg pain and occasional numbness that felt like deep vein thrombosis. Tr. 607, 611-612. Lindsey was not taking her Coumadin daily. Tr. 611. Lindsey's physical examination findings were normal. Tr. 612. Testing showed no sonographic evidence of deep venous thrombosis in the left lower extremity or visualized portions of the right lower extremity. Tr. 607.

On August 12, 2014, Lindsey saw Dr. O'Malia for a brief visit. Tr. 678-687. Lindsey was late for her appointment and the doctor had to leave for another appointment. Tr. 678. Lindsey relayed that she was generally not taking Humalog because she was afraid of hypoglycemia. Tr. 678. She was taking metformin and asked about Lantus and glyburide. Tr. 678. Lindsey had numbness in her feet but no foot sores or calluses. Tr. 679. Lindsey reported

neck pain. Tr. 679. She indicated she was taking her Coumadin as directed. Tr. 679. Lindsey's mood and affect were observed to be normal. Tr. 681. Dr. O'Malia instructed Lindsey that she needed to take at least 2-3 units of Humalog with each meal and that she needed to bring her blood sugar readings with her to appointments because, without them, she could not adjust Lindsey's medication. Tr. 681.

Lindsey saw Dr. O'Malia on September 5, 2014, for follow up regarding her diabetes and neck pain. Tr. 666-677. Lindsey's neck pain was primarily on the left and it was worse with turning. Tr. 666. Lindsey was taking ibuprofen for her neck pain when severe. Tr. 666. She felt that physical therapy helped with her neck pain when they did traction and massage. Tr. 666. The TENS unit provided no relief. Tr. 666. She was not taking her Neurontin regularly and was not sure it worked. Tr. 666. Her pain was better with heat, topical medication and ibuprofen. Tr. 667. Lindsey had started to take her Humalog. Tr. 667. However, she was only taking it at lunch. Tr. 667. Lindsey was checking her feet each day and reported numbness in her feet and foot sores or calluses. Tr. 667. On examination, Dr. O'Malia observed normal range of motion in Lindsey's cervical spine with pain with right lateral flexion and forward flexion, moderate pain with rotation to the left and mild pain with rotation to the right, no pain with extension, and no pain with left lateral flexion; 5/5 strength and sensation intact to light touch in bilateral upper extremities; mild cervical paraspinal tenderness; and mild lower cervical spinal tenderness. Tr. 669-670. Lindsey's mood and affect were normal. Tr. 670. Dr. O'Malia instructed Lindsey to increase her insulin taken with meals. Tr. 670. Also, because of some high morning sugar readings and middle of the night sweating, Dr. O'Malia wanted Lindsey to check a few middle of the night blood sugars and call them in. Tr. 670. Dr. O'Malia would then adjust Lindsey's insulin accordingly. Tr. 670. Dr. O'Malia advised Lindsey to see ophthalmology for diabetic

retinopathy. Tr. 670. For her cervical radiculopathy, Dr. O'Malia indicated that Lindsey was not taking her Neurontin frequently enough or at a high enough dose so she advised Lindsey to start taking her Neurontin on a regular basis and to increase the amount. Tr. 670. A home traction unit and physical therapy consult were also recommended. Tr. 670.

At the end of September 2014, after falling out of a swing, Lindsey sought emergency room treatment for injury to her neck, head, and chest. Tr. 600-606. A radiograph of Lindsey's chest showed no evidence of acute cardiopulmonary disease (Tr. 600) and a head CT showed no evidence of acute intracranial abnormality and a cervical spine CT showed no evidence of fracture or malalignment in the cervical spine (Tr. 601-602). The cervical spine CT showed mild disc and uncovertebral joint degenerative change, most prominent at C6-C7, and mild left neuroforaminal stenosis. Tr. 601-602. Lindsey was discharged with diagnoses of contusion and soft tissue injury of the neck. Tr. 603.

During an October 7, 2014, urgent care visit for treatment of a urinary tract infection, it was noted that Lindsey's diabetes was poorly controlled, there were trace ketones in her urine, and Lindsey needed to stay hydrated, take her diabetes medications as directed, and follow up with her primary care physician. Tr. 656. A few days later, Lindsey was at the emergency room with complaints of dysuria, lightheadedness, generalized weakness, and pelvic pain. Tr. 581-599. Findings from a CT scan of Lindsey's abdomen and pelvis were suggestive of colitis and hyodensities were seen in the left kidney, which were deemed most likely cysts. Tr. 584. Later in October 2014, while waiting to be seen for a therapy visit, Lindsey started having chest pains and she was transported to the emergency room. Tr. 688-700, 715. At the emergency room, Lindsey described her pain as mild and dull and associated with anxiety. Tr. 690. She reported no back pain and no weakness or numbness. Tr. 691. Physical examination findings included

normal ranges of motion, no edema and no tenderness. Tr. 692. She had a normal heart rate, regular rhythm and normal heart sounds. Tr. 692. Lindsey's mood and affect were normal. Tr. 692. Lindsey was discharged the same day with a diagnosis of chest pain of unclear cause. Tr. 698.

On November 25, 2014, Lindsey returned to see Dr. O'Malia for follow up regarding her diabetes. Tr. 639-654. Lindsey was not always taking her Humalog at breakfast and was not taking her Humalog with dinner because she was concerned about taking it with Lantus. Tr. 639, 643. Lindsey continued to report neck pain with pain and numbness in her left upper extremity. Tr. 641. She was dropping things and indicated that her last three fingers were numb to touch. Tr. 641. Lindsey was on Neurontin but she had not taken it that week and had not been taking it regularly. Tr. 641. With respect to her diabetic neuropathy, Lindsey complained of pain in her feet and toes, which she described as stabbing pain with a burning sensation, like her feet were on fire. Tr. 641. It hurt Lindsey to wear shoes. Tr. 641. Lindsey was taking her Coumadin as directed. Tr. 640. On physical examination, Dr. O'Malia observed normal range of motion in the cervical spine with mild pain with extremes in all directions, 5/5 strength in bilateral upper extremities except decreased grip strength on the left and decreased strength in the lumbricals on the left, mild tenderness to palpation in cervical spine and paraspinal areas, no edema in extremities and pulses were intact in extremities. Tr. 642. Lindsey's mood and affect were normal. Tr. 642. Dr. O'Malia indicated that Lindsey's diabetes was uncontrolled but improving. Tr. 643. Dr. O'Malia reminded Lindsey that she needed to take her Humalog as directed and that there was no concern with taking Humalog close in time to taking Lantus. Tr. 643. Dr. O'Malia instructed Lindsey to restart Neurontin for her diabetic neuropathy and cervical radiculopathy.

Tr. 643.  Dr. O'Malia also recommended a pain management consultation for Lindsey's cervical radiculopathy.  Tr. 643.

Lindsey was seen at the emergency room multiple times during 2015.  *See e.g.*, Tr. 779, 795, 806.  In February, she was seen for pain and swelling in her left thigh.  Tr. 803-811.  An ultrasound of the left leg taken was negative for deep venous thrombosis.  Tr. 803.  In March, Lindsey was seen at the emergency room for abdominal pain.  Tr. 795.  A CT scan of the abdomen and pelvis showed that the bowel wall had improved in appearance, as compared to the prior scan, and there was no acute abdominal or pelvic abnormality.  Tr. 789.  In May, Lindsey was seen in the emergency room for "multiple vague complaints, dizziness, not feeling well, coughing."  Tr. 779.  The attending physician noted that overall Lindsey's physical examination was relatively normal and that Lindsey's symptoms were very nonspecific and the findings were "not backing up any significant treatable issue at [that] time."  Tr. 779.  The attending physician did note that Lindsey's sugar had been out of control for a few weeks and that she should follow up with her primary care physician.  Tr. 779.  Lindsey's diagnoses on discharge were hyperglycemia and dizziness.  Tr. 787.

In April 2015, Lindsey received a cervical epidural steroid injection at the Cleveland Clinic Pain Management Center.  Tr. 825-827.  Lindsey saw Dr. O'Malia on June 26, 2015.  Tr. 843-853.  Lindsey had been taking care of an ill family member for about a month.  Tr. 843.  She was still not taking Humalog as directed.  Tr. 843.  Dr. O'Malia reminded Lindsey to take her medication as directed.  Tr. 846.  She was checking her feet daily and reported no numbness but she did have foot sores or calluses.  Tr. 844.  She last saw a podiatrist in 2014.  Tr. 844.  Lindsey relayed that she was in counseling.  Tr. 844.  She was prescribed anti-depressants but had not been taking them.  Tr. 844.  Dr. O'Malia encouraged her to try her medication for at least 6

months.  Tr. 844.  Lindsey continued to report chronic neck and back pain.  Tr. 844.  She reported that her cervical injection had helped but she felt weird after the injection for several days and her blood sugar was in the low 300s after the injection.  Tr. 844.  On physical examination, Lindsey's extremities showed no edema and her peripheral pulses were intact.  Tr. 846.  Dr. O'Malia observed that Lindsey appeared to have a mildly anxious and depressed mood and a mildly blunted affect.  Tr. 846.

On August 20, 2015, Lindsey saw Dr. O'Malia.  Tr. 829-842, 854.[4]  Lindsey had recently been at the emergency room for a mild headache and left-sided numbness.  Tr. 829.  She was worried that she was having a stroke.  Tr. 829.  She had been diagnosed with a migraine with aura.  Tr. 829.  The numbness that Lindsey had experienced was felt to be a result of the aura.  Tr. 829.  Her headaches came and went since her discharge from the emergency room.  Tr. 829.  At the time of her visit with Dr. O'Malia, the numbness on the left side of her body had not gone away.  Tr. 829.  It was difficult for Lindsey to do things with her left arm because it felt weird – she could not really say whether that arm was weaker.  Tr. 829.   Lindsey was still not taking her diabetes medication as directed – she was continuing to skip Humalog at dinner and she was frequently skipping her Lantus at night.  Tr. 854.  Lindsey reported no increase in her chronic back pain.  Tr. 830.  She was continuing to have left hip pain.  Tr. 830.  She sometimes had sharp pain with walking and achiness.  Tr. 830.  On examination, Dr. O'Malia observed mild tenderness in the back and normal range of motion of the lumbrosacral spine with mild pain; left hip tenderness, pain with resisted hip flexion, no pain with internal/external rotation; no pain with knee flexion/extension; 5/5 strength in upper and lower extremities; decreased sensation in lower left extremity and left side of Lindsey's face as compared to the right side; and mildly

---

[4] The first page of the August 20, 2015, treatment notes is at Tr. 854.  The balance of the August 20, 2015, treatment notes are located at Tr. 829-842.

anxious mood and normal affect.  Tr. 832.  Dr. O'Malia spoke with Dr. Zayat and he agreed with

Dr. O'Malia that Lindsey's presentation was more stroke-like than migranious.  Tr.  833.  Dr.

Zayat recommended continuing Lindsey on Coumadin and adding aspirin.  Tr. 833.  Lindsey was

referred to neurology for a consult.  Tr. 833.  Dr. O'Malia noted that Lindsey had had an

abnormal echocardiogram and referred her to cardiology for a consult.  Tr. 833.  Dr. O'Malia

continued to assess uncontrolled diabetes and reinforced the need to take her diabetes medication

as directed.  Tr. 833.  With respect to Lindsey's left hip pain, Dr. O'Malia suspected a flexor

tendon avulsion but noted there were no avulsion fractures seen on the x-ray.  Tr. 833.  She

recommended conservative therapy with rest and Tylenol and Lidoderm as needed.  Tr. 833.

Upon Dr. O'Malia's referral, on August 31, 2015, Lindsey saw Dr. Abdul R. Wattar,

M.D., a cardiologist, regarding her abnormal echocardiogram findings.  Tr. 887-890.  Dr. Wattar

discussed possible further testing, including a TEE (transesophageal echocardiography) and

stress test.  Tr. 890.  Lindsey saw Dr. Wattar for follow up on September 16, 2015.  Tr.  879-886.

During that visit, Lindsey reported no joint swelling, back pain, knee pain, hip pain, or neck pain.

Tr. 881.  Lindsey's TEE and ECG were normal.  Tr. 883.  Lindsey followed up again with Dr.

Wattar on October 28, 2015.  Tr. 871-878.  Lindsey had undergone a stress nuclear test.  Tr. 875.

There was no evidence of infarct or ischemia.  Tr. 875.  Dr. Watter recommended "aggressive

life style adjustment[,]" including smoking cessation, improving her lipids, and maintaining good

control of her diabetes.  Tr. 875.

Also upon Dr. O'Malia's referral, Lindsey saw Dr. Joseph Zayat, M.D., a neurologist, for

evaluation of her headaches.  Tr. 897-904.  Lindsey relayed that she started having recurrent

headaches about 6-8 eight months earlier and her headaches were occurring on average every

other day and lasted all day.  Tr. 897.  She described the pain as an aching sensation with an

intensity level of a 7-8/10. Tr. 897. Lindsey also indicated that, on August 5, she suddenly developed left-sided numbness that affected her face, arm and leg and, ever since then, she had been dropping objects out of her left hand. Tr. 897. She subjectively felt that the strength of her left-hand grip was weaker. Tr. 897. Also, she relayed that her feet were numb and she was limited to walking for about 5 minutes. Tr. 897. Dr. Zayat noted that Lindsey was using a cane. Tr. 900. Dr. Zayat observed 5/5 strength within Lindsey's upper and lower extremities, deep tendon reflexes were 1/4; ankle reflexes were absent; plantar reflex was neutral bilaterally; and sensory modalities were reduced on the left arm and leg. Tr. 900. Dr. Zayat indicated that the MRI showed no infarct or small hemorrhage. Tr. 900. Dr. Zayat noted that the infarct may have been too small to have shown up on the MRI. Tr. 900. Dr. Zayat explained to Lindsey that she had a stroke that was secondary to small vessel disease from the combination of active vascular risk factors and she needed to keep her vascular risk factors, e.g., diabetes, high blood pressure, cholesterol, and smoking, under control. Tr. 900-901.

### Mental impairments

On March 27, 2014, Lindsey had a mental health diagnostic assessment completed at Signature Health. Tr. 730-739. Lindsey relayed that she had been receiving treatment for her depression and anxiety through her primary care physician. Tr. 740. Zoloft had not helped and recently she had been unable to get Xanax through her primary care physician. Tr. 740. She was having increased anxiety and panic attacks and was not going into public places because she did not like to be around people. Tr. 740. Lindsey complained "I have a lot of stuff, mentally feels overwhelmed, depressed and anxious." Tr. 730. She also relayed that she had a handicapped child who was terminally ill and was taken by the state and placed in a group home, which made her feel very sad. Tr. 730, 740. She had a boyfriend but did not feel like she could give in the

relationship, she had no friends, and she felt like she was judged by everyone.  Tr. 730.  She was living with and had a good relationship with her mother.  Tr. 733.  Lindsey was interested in seeing a physician and starting counseling to talk about her feelings.  Tr. 740.  On examination, Lindsey's eye contact was fair, her attention/concentration was distractible, her mood/affect was flat, her speech was normal, her behavior/attitude was cooperative, her hygiene was fair, her intellectual functioning was average, she was fidgety, her immediate recall and recent events memory was poor, her remote events memory was fair, her insight/judgment was limited, and her thought process showed flight of ideas.  Tr. 736-737.  Lindsey's diagnoses were agoraphobia with panic disorder and recurrent depression moderate.  Tr. 731.  Also listed were diagnoses of recurrent depression severe and post-traumatic stress disorder entered on October 25, 2012, from past treatment.  Tr. 731.

In early May 2014, Lindsey starting seeing a nurse practitioner and therapist at Signature Health.  Tr. 727-729.  Lindsey relayed that she had been separated for 16 years and reported a history of physical abuse from her husband.  Tr. 728.  She reported anxiety and sadness because she was unable to see her son – she was limited to only two hours per month.  Tr. 728.  She felt guilty doing anything without her son.  Tr. 729.  Lindsey was tearful during her therapy session.  Tr. 729.  Lindsey continued treatment at Signature Health for her mental impairments during 2014 and 2015.  Tr. 710-726, 742-770, 815-822.

In June 2014, Lindsey relayed that she was planning a benefit dinner to try to raise funds to cover legal costs associated with her attempts to get visitation with her son.  Tr. 724.  Lindsey reported some improvement in sleep but she was having difficulty with motivation, she was isolating, she was crying a lot, and she was having ongoing panic attacks.  Tr. 724.  She had tried

Zoloft, Lexapro, Paxil and Remeron.  Tr. 724.  Lindsey was started on Cymbalta and her Klonopin was continued.  Tr. 724.

In July 2014, Lindsey relayed that the event to raise money to seek visitation with her son had been scheduled.  Tr. 722.  She was feeling more positive and her mood was improved.  Tr. 722.  Her medications – Cymbalta and Vistaril – were continued.  Tr. 722.  On August 27, 2014, Lindsey relayed that the benefit to raise money for her son was not successful – she was feeling very depressed and she had stopped all her medication but had recently restarted the Vistaril, Klonopin and insulin.  Tr. 719.  Her mother had forced her to come in to her appointment with her nurse practitioner.  Tr. 719.  Lindsey's nurse instructed Lindsey to restart her Cymbalta, continue her Vistaril and Klonopin, and make a counseling appointment.  Tr. 719.  Lindsey indicated that she was utilizing Klonopin when her anxiety got bad and supplemented with Visatril, which covered most of her "anxiety."  Tr. 718.  In September 2014, Lindsey reported an increase in symptoms of depression.  Tr. 717.  She was sleeping more and preoccupied with her son.  Tr. 717.  Lindsey's nurse increased Lindsey's Cymbalta, instructed her to hold back on taking Vistarili if she was too tired, and to use Klonopin for infrequent panic attacks.  Tr. 717.

In December 2014, Lindsey was struggling with anxiety and panic attacks.  Tr. 710-714.  She explained that she was dealing with taking care of her mother who was recovering from multiple health issues, she was living with an alcoholic boyfriend, she was babysitting her 2 year old granddaughter on a daily basis, and there was an upcoming court date regarding custody issues with her son.  Tr. 710-714.

After a "long break" in sessions (Tr. 758), Lindsey returned for therapy at Signature Health in June 2015 (Tr. 742-770, 815-822).  She reported a lot of panic attacks and identified her home life as a trigger.  Tr. 758.

During a nurse visit in July 2015, Lindsey reported that she was unable to shut down her thoughts and she was having daily panic attacks. Tr. 746. She was only taking Klonopin and had stopped other psychotropic mediations because she was afraid of reactions. Tr. 746. Lindsey relayed that the court ordered that she could have visitation one hour per month at home with her son. Tr. 746. Lindsey's diagnoses at that time were recurrent major depression, severe; agoraphobia with panic disorder; and post-traumatic stress disorder. Tr. 745.

Prior to and during a counseling session on August 5, 2015 (Tr. 816-822), Lindsey was experiencing a panic attack (Tr. 815, 821-822). Lindsey's therapist worked to calm Lindsey and worked to help her with managing her emotions. Tr. 815, 821-822.

### 2. Opinion evidence

#### a. Physical therapist

Physical therapist Jennifer Diehl of Drayer Physical Therapy Institute evaluated Lindsey on February 24, 2014. Tr. 462-467, 555-562. Lindsey was referred to Drayer Physical Therapy for a Functional Capacity Evaluation to assess her level of physical capacities for a determination of disability. Tr. 463. Lindsey's complaints included neck pain and difficulty turning, especially to the left, and left hip and knee pain that affected walking, sitting, driving, squatting, and lifting. Tr. 463, 561, 562. Ms. Diehl concluded that Lindsey had the ability to work in the sedentary Dictionary of Occupational Titles (DOT) category. Tr. 462, 467. Ms. Diehl's testing indicated that Lindsey was unable to lift, push or pull at the frequent to constant level. Tr. 462. She could perform some occasional lifting under 20 pounds, except she could not perform overhead lifting. Tr. 462. She could push and pull occasionally. Tr. 462.

In a Medical Statement – Physical Abilities and Limitations, Ms. Diehl was of the opinion that Lindsey suffered from moderate pain[5] and Lindsey's impairments and/or treatment would cause her to be absent from work more than three times a month. Tr. 561. Ms. Diehl indicated that Lindsey could work for 2 hours per day; stand for 30 minutes at one time; stand for 2 hours in a workday; sit for 30 minutes at one time; sit for 2 hours in a workday; lift 10 pounds occasionally; and lift less than 5 pounds frequently. Tr. 561. Ms. Diehl also indicated that Lindsey could occasionally bend, stoop, balance, raise right and left arms over shoulder level, work around dangerous equipment, operate motor vehicles, tolerate heat, cold, dust, smoke, fumes, and noise and, Lindsey could frequently perform fine and gross manipulation bilaterally. Tr. 561. Ms. Diehl indicated that Lindsey could never tolerate heights. Tr. 561.

In a separately completed pain questionnaire, Ms. Diehl stated the intensity and persistence of Lindsey's pain resulted in an inability to lift frequently, climb ladders, kneel, crawl, and crouch. Tr. 562. Ms. Diehl also indicated that Lindsey's pain was severe enough to often interfere with her attention and concentration. Tr. 562.

### b.      State agency reviewing physicians

*Physical*

On April 30, 2014, state agency reviewing physician William Bolz, M.D., completed a physical RFC assessment. Tr. 135-137. Dr. Bolz indicated that he was not adopting the prior November 27, 2013, RFC assessment because there were new impairments and medical evidence in the file. Tr. 136. He opined that Lindsey could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday and sit about 6 hours in an 8-hour workday; and push and/or pull unlimitedly except as shown for lift and/or

---

[5] The available rating choices regarding pain level were "none," "mild," "moderate," "severe," and "extreme." Tr. 561.

carry. Tr. 135. With respect to postural limitations, Dr. Bolz opined that Lindsey could never climb ladders/ropes/scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and frequently climb ramps/stairs. Tr. 135-136. Also, Dr. Bolz opined that Lindsey would have to avoid concentrated exposure to hazards such as unprotected heights. Tr. 136.

Upon reconsideration, on June 10, 2014, state agency reviewing physician Robert Wysokinski, M.D., completed a physical RFC assessment. Tr. 148-150. Dr. Wysokinski reached the same opinions as Dr. Bolz. Tr. 135-137, 148-150. However, Dr. Wysokinski indicated that his RFC assessment was an adoption of the prior RFC under AR 98-4 Drummond Ruling. Tr. 149.

*Mental*

On April 25, 2014, state agency reviewing psychologist Cynthia Waggoner, Psy.D., completed a Psychiatric Review Technique ("PRT") and a mental RFC assessment. Tr. 132-134. 137. Dr. Waggoner found that Lindsey had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration. Tr. 133. Dr. Waggoner concluded that there was no new and material evidence and adopted the November 27, 2013, mental RFC under AR 98-4 Drummond Ruling – ability to perform tasks in a setting with no fast pace, where claimant is allowed to take infrequent extra breaks, and no more than infrequent changes, occasionally interact with supervisors and coworkers, and never interact with the public. Tr. 133, 137.

Upon reconsideration, on June 11, 2014, state agency reviewing psychologist Todd Finnerty, Psy.D., completed a PRT and mental RFC assessment. Tr. 145-147, 150. Like, Dr. Waggoner, Dr. Finnerty reached the same conclusions as Dr. Waggoner. Tr. 146-147, 150.

**C. Hearing testimony**

**1. Plaintiff's testimony**

Lindsey testified and was represented at the hearing. Tr. 35-59, 60-61. Lindsey stopped working in 2011 because of the pain in her knee, back, and neck and because of her panic attacks. Tr. 49, 50. Since November 2013, Lindsey stated that she has experienced changes in her diabetic neuropathy, back, panic attacks, and depression. Tr. 51. Lindsey wanted to work but did not believe she was capable of working at that time. Tr. 55.

Lindsey was diagnosed with diabetes when she was 25 years old. Tr. 51. She takes oral medication and insulin for her diabetes. Tr. 51. She checks her blood sugar four to five times each day and makes adjustments to her insulin. Tr. 51. Her diabetes in uncontrolled. Tr. 56-57. Lindsey takes both Lantus and Humalog. Tr. 57. She is nervous about taking the Humalog so she takes only a very small dose. Tr. 57. Lindsey indicated she was compliant with her treatment regime. Tr. 58. Lindsey's diabetic neuropathy causes tingling and numbness in her legs, feet and hands. Tr. 52. Also, Lindsey's left arm frequently goes numb and she rubs it. Tr. 54-55. This occurred during the hearing. Tr. 54. When asked whether rubbing helped with the numbness, Lindsey indicated she was not sure – she thinks she rubs it to make sure it is still there because she cannot feel it. Tr. 54. Her left arm has been going numb for close to a year but had gotten worse in the prior months. Tr. 55.

Lindsey was scheduled to see a neurologist because she had a stroke which caused continuing numbness in her left side and in her face. Tr. 53. She was also scheduled to see a cardiologist because of blockage in her heart. Tr. 53.

Lindsey has pain in her back, with the most painful area of her back being her lower back. Tr. 37. On an average day, Lindsey indicated that her low back pain was an 8 on a scale

of 1-10, with 10 being the most severe.  Tr. 37.  Lindsey indicated that she does not take any prescription pain medication because her doctor, with whom she has been treating for years, does not believe in prescribing it.  Tr. 37.  She takes over-the-counter extra strength Tylenol three to four time each day.  Tr. 37-38.

Lindsey has neck pain which she also rated an 8.  Tr. 38.  With Tylenol, her neck pain is brought down to about a 6.  Tr. 38.

Lindsey has left shoulder pain.  Tr. 39.  Lindsey rated her left shoulder pain on an average day to be a 6 or 7.  Tr. 38-39.  She is left handed.  Tr. 39.  She has numbness on her left side and some pain when reaching.  Tr. 40.  Lindsey is able to write with her left hand; her handwriting, however, is a little sloppier than normal.  Tr. 40.  Also, due to tingling in her hands from diabetic neuropathy, after writing for about 5 or 10 minutes, Lindsey has to stop for about that same amount of time and massage her hand until some of the feeling comes back.  Tr. 52. Lindsey uses her right hand to lift a cup of coffee.  Tr. 41-42.  She does not have problems picking up small items from a table.  Tr. 41.

Lindsey has problems with her left hip.  Tr. 42.  She rated her hip pain as an 8 and sometimes a 10.  Tr. 42.  Dr. O'Malia had recently prescribed a cane for Lindsey to use.  Tr. 42. Lindsey switches between her right and left hands to hold her cane.  Tr. 55.  She uses her cane both in the house and when out in public.  Tr. 55-56, 58-59 .  Lindsey estimated being able to stand without using her cane or leaning on something, such as a counter, for about five minutes. Tr. 56.

The tingling is worse in Lindsey's legs than in her arms.  Tr. 42.  She estimated being able to walk about 10-15 steps before experiencing a lot of pain in her left knee and hip.  Tr. 43. She could previously walk about 25 steps before having pain.  Tr. 53.  She estimated being able

to lift about 4 pounds.  Tr. 43-44.  During the course of the administrative hearing, the ALJ noted that Lindsey had been shifting in her seat.  Tr. 44.  The ALJ then asked Lindsey how long she is able to sit with shifting in her seat.  Tr. 44-45.  Lindsey estimated having to get up after about 30 minutes of sitting.  Tr. 45.

Lindsey also discussed her mental impairments, indicating she has anxiety, depression, and post-traumatic stress disorder.  Tr. 45, 54.  She takes medication for both conditions – Klonopin and Prozac.  Tr. 45.  Lindsey indicated that the Klonopin helps "somewhat with the panic attacks, but not really."  Tr. 45.  She continues to have problems driving and going into stores.  Tr. 45-46.  She felt that Xanax helped her more with her panic attacks but she was taken off it.  Tr. 46-47.  Lindsey estimated having at least three panic attacks every day but has not identified any particular triggers for them.  Tr. 47.  She has been unable to find the right medication to help her with her depression.  Tr. 46.  Lindsey did not have difficulty getting along with supervisors and coworkers when she was working but she gets panic attacks when out in public, e.g., a crowded grocery store.  Tr. 46, 49-50.  She is able to go into small stores.  Tr. 50.  Lindsey attends counseling once a week.  Tr. 53.  Although her medical providers wanted her to start group counseling, she was scared to attend because it required her to be with people.  Tr. 53-54.

Lindsey does not do much around the house because of the pain in her hip.  Tr. 47.  She helps her mom cook a little but not much.  Tr. 47.  She can put a load of laundry in herself but cannot vacuum or do the dishes.  Tr. 48-49.  Lindsey has a driver's license but drives only once or twice a week.  Tr. 35-36.  She has anxiety when getting on freeways.  Tr. 36.  She stays home a lot due to panic attacks.  Tr. 36.  During the day, Lindsey and her mom watch some shows,

walk down the driveway and back, and sit outside.  Tr. 49.  Lindsey periodically reads books and magazines.  Tr. 49.

### 2. Vocational expert's testimony

Vocational Expert Gail A. Klier ("VE") testified at the hearing.  Tr. 59-78, 333.  The VE described Lindsey's past caregiver position as that of "caregiver personal services."  Tr. 63.  She indicated that, per the DOT, the position is classified as a semi-skilled, medium position.  Tr. 63. Lindsey performed the job at the light level.  Tr. 63.

The ALJ first asked the VE to consider a hypothetical individual limited to light work except the individual can never climb ladders, ropes or scaffolds; can occasionally climb ramps or stairs; can occasionally balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to hazards, such as unprotected heights; can perform tasks in a setting with no fast pace where the individual is allowed to take infrequent extra breaks, and no more than infrequent changes; and can occasionally interact with supervisors and coworkers but never interact with the public.  Tr. 63-64.  The VE indicated that the described individual would be unable to perform Lindsey's past work but there would be light, unskilled jobs available in the regional or national economies that the described individual could perform, including price marker, laundry aide, and housekeeping cleaner.  Tr. 65-66.  The VE provided state and national job incidence data for the jobs identified.  Tr. 66.  Lindsey's counsel asked the VE to explain how she defined the extra infrequent breaks.  Tr. 73.  The VE indicated that she understood the limitation to mean less than 10 minutes – minimal and infrequent.  Tr. 73-74.

For his second hypothetical, the ALJ asked the VE to consider an individual limited to light work who can never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs; balance, stoop, kneel, crouch and crawl; must avoid concentrated exposure to hazards such as

dangerous machinery and unprotected heights; reach overhead occasionally with the left dominant upper extremity; limited to routine tasks with no fast pace work, no production quotas, and minimal and infrequent changes in the work setting; no direct work-related interaction with the public; and occasional interaction with coworkers and supervisors. Tr. 66-67. The VE indicated that the three jobs identified in response to the first hypothetical would remain available to the individual described in the second hypothetical. Tr. 67.

For his third hypothetical, the ALJ asked the VE to consider the individual described in the second hypothetical with the additional limitation of being provided the opportunity to alternate positions between standing and sitting at approximately 30 minute intervals. Tr. 67-68. The ALJ clarified that the sit-stand option would mean that the individual remains at her workstation with no loss of productivity. Tr. 68. The VE indicated that adding the sit-stand option would not change the availability of the jobs previously identified. Tr. 68.

For his fourth hypothetical, the ALJ asked the VE to consider the second hypothetical with all limitations except, instead of being limited to light work, the described individual would be limited to sedentary work. Tr. 68. The VE indicated that there would be sedentary, unskilled jobs available, including document preparer, addresser, and surveillance security monitor. Tr. 68-69. The VE provided state and national job incidence data for each of the identified jobs. Tr. 68-69. For the document preparer and addresser jobs, the VE reduced the job incidence numbers by half to account for the fact that the duties of those positions are often performed as other clerical functions -- within other clerical occupations. Tr. 68-69. With respect to the surveillance security monitor, the VE indicated that the DOT describes the position as monitoring premises of public transportation terminals but the VE provided numbers for surveillance in any industry/facility, which was information based on her experience and

observations over the years.  Tr.  69.  Lindsey's counsel questioned the VE about the number and availability of surveillance security monitor positions that were in fact sedentary and unskilled. Tr. 71-72.

Lindsey's counsel asked the VE an alternate hypothetical, which was based on the functional capacity evaluation set forth in Exhibit 5F (Ms. Diehl's evaluation (Tr. 556)).  Tr. 74. She asked the VE to consider the ALJ's second hypothetical but with a sedentary work limitation and the additional limitations of: somewhere between occasionally and frequently handling and fingering; only occasional foot controls; and no kneeling, crawling, or crouching.  Tr. 74-75. The VE indicated that the document preparer and addresser jobs would not be available but the surveillance position would remain available.  Tr. 75-76.

Lindsey's counsel then asked the VE another hypothetical, also based on Ms. Diehl's evaluation.  Tr. 76, 561.  She asked the VE to consider an individual who can only stand at one time for no more than 30 minutes, lift no more than 10 pounds occasionally, lift less than 5 pounds frequently, perform frequent fine and gross manipulation, and would be absent from work more than 3 times per month.  Tr. 76.  The VE indicated that there would be no jobs available for the described individual.  Tr. 76-77.

In response to further questioning by Lindsey's counsel, the VE indicated that, if an individual with a sit-stand option that allows for alternating between sitting and standing every 30 minutes needed to lean on her work surface or use a cane in one hand for most of the 30 minutes standing period, there would be no jobs available.  Tr. 77.

Finally, Lindsey's counsel asked the VE to consider the ALJ's second hypothetical but with a sedentary work limitation and with the additional limitations of: using right hand

frequently and left hand occasionally for fine and gross manipulation. Tr. 77. The VE indicated that the surveillance job would be available. Tr. 77-78.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[6] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d

119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof

at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy. *Id.*

## IV. The ALJ's Decision

In his February 3, 2016, decision, the ALJ made the following findings:[7]

1.      Lindsey met the insured status requirements through September 30, 2015. Tr. 15.

2.      Lindsey had not engaged in substantial gainful activity since November 28, 2013, the alleged onset date. Tr. 15.

3.      Lindsey had the following severe impairments: insulin-dependent diabetes mellitus, cervical degenerative joint disease, thoracolumbar degenerative disc disease, peripheral neuropathy, and anxiety-related disorder. Tr. 15-16. Other impairments were non-severe, including hypertension, deep vein thrombosis, mild diabetic retinopathy, and depression. Tr. 15-16. Left shoulder/elbow tendinitis pain was a non-medically determinable impairment. Tr. 16.

4.      Lindsey did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 16-18.

---

[6] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[7] The ALJ's findings are summarized.

5.      Lindsey had the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except lift or carry 20 pounds occasionally and 10 pounds frequently; stand or walk 6 hours out of 8 hours; sit 6 hours out of 8 hours; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; must avoid concentrated exposure to hazards, such as unprotected heights; can perform tasks in a setting with no fast pace, where she is allowed to take infrequent extra breaks, and no more than infrequent changes; occasionally interact with supervisors and coworkers; and never interact with the public. Tr. 18-22. This RFC was an adoption of the November 27, 2013, RFC. Tr. 20.

6.      Lindsey was unable to perform any past relevant work. Tr. 22.

7.      Lindsey was born in 1967 and was 46 years old, defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 22.

8.      Lindsey had a limited education and was able to communicate in English. Tr. 22.

9.      Transferability of job skills was not material to the determination of disability. Tr. 22.

10.     Considering Lindsey's age, education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that Lindsey could perform, including price marker, laundry aide, and housekeeping cleaner. Tr. 22-23.

Based on the foregoing, the ALJ determined that Lindsey had not been under a disability from November 28, 2013, through the date of the decision. Tr. 23.

## V. Parties' Arguments

Lindsey argues that the ALJ erred in assessing her RFC. Doc. 12, pp. 15-20, Doc. 15, pp. 1-3. She contends that the ALJ acknowledged new and additional evidence regarding her impairments and therefore erred by adopting the prior ALJ's RFC rather than assessing a new RFC. Doc. 12, pp. 16-17, Doc. 15. In making this argument, Lindsey contends that the ALJ did not properly evaluate her impairments at Step Two, failed to consider any new evidence when formulating her RFC, based his findings on incomplete and/or partial recitations of the facts, and

erred when he assigned no weight to Ms. Diehl's Functional Capacity Evaluation. Doc. 12, pp. 15-20, Doc. 15, pp. 3-4. Lindsey next argues that the ALJ did not properly evaluate her credibility. Doc. 12, pp. 20-22. Lastly, Lindsey argues that the ALJ did not meet his burden at Step Five of the sequential evaluation, arguing again that the ALJ disregarded evidence which would have modified the prior ALJ's RFC. Doc. 12, pp. 22-25.

In response, the Commissioner argues that, although the ALJ found that the record contained new and material evidence since the prior ALJ's decision, the ALJ properly concluded that that evidence did not provide a basis for a different RFC finding. Doc. 14, p. 12. The Commissioner also argues that the ALJ did not err at Step Two (Doc. 14, pp. 12-14), the ALJ's RFC analysis, including the ALJ's assessment of Lindsey's credibility and the evaluation of Ms. Diehl's opinion, is supported by substantial evidence (Doc. 14, pp. 14-22), and substantial evidence supports the ALJ's Step Five determination (Doc. 14, pp. 22-23).

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial

evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

## B.    *Drummond* **rule**

In *Drummond v. Comm'r of Soc. Sec*, the Sixth Circuit stated that, "[a]bsent evidence of improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." 126 F.3d 837, 842 (6th Cir. 1997) (relying in part on *Dennard v. Secretary of Health & Human Serv.*, 907 F.2d 598, 600 (6th Cir. 1990), stating that the court in *Dennard* "held that a second ALJ was precluded from reconsidering whether plaintiff Dennard could perform his past relevant work.").

The Social Security Administration acquiesced in the *Drummond* decision and explained how *Drummond* would apply. *See* Acquiescence Ruling 98-4(6), 1998 WL 283902 (June 1, 1998) ("AR 98-4(6)").[8] The Social Security Administration stated:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the

---

[8] The Social Security Administration also acquiesced in the *Dennard* decision. *See* Acquiescence Ruling 98-3(6), 1998 WL 283901 (June 1, 1998) ("AR 98-3(6)") (addressing how the Social Security Administrative will apply the *Dennard* decision).

prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

*Id* at *3; *see also* AR 98-3(6).

As further explained by courts reviewing *Drummond* challenges, in order to avoid the *res judicata* effect of *Drummond*, a claimant must present new and material evidence demonstrating that her condition worsened. *Drogowski v. Comm'r of Soc. Sec.*, 2011 WL 4502988, * 8 (E.D. Mich July 12, 2011) (relying on *Casey v. Sec. of Health and Human Servs.*, 987 F.2d 1230, 1232-1233 (6th Cir. 1993) and *Priest v. Soc. Sec. Admin.*, 3 Fed. Appx. 275, 276 (6th Cir. 2001)), *report and recommendation adopted,* 2011 WL 4502955, * 3 (E.D. Mich. Sept. 28, 2011); *see also Thomas v. Comm'r of Soc. Sec.*, 2014 WL 3845797, * 9 (N.D Ohio Aug. 5, 2014) (quoting *Drogowski*, 2011 WL 4502988, * 8) ("It is Plaintiff's burden to show circumstances have changed since the prior ALJ's decision 'by presenting new and material evidence of deterioration.'").

## C.    Lindsey has not demonstrated that the ALJ's decision is unsupported by substantial evidence

### 1.    The ALJ did not misapply *Drummond*

The ALJ properly recognized the *Drummond* standard.  Tr. 12.  Lindsey argues that, because the ALJ found that Lindsey had a new severe impairment since the prior ALJ's decision, i.e., peripheral neuropathy, the ALJ erred in adopting the prior RFC.   As reflected in the decision, the ALJ found peripheral neuropathy to be a severe impairment (Tr. 15) and he considered evidence regarding peripheral neuropathy at both Step Three (Tr. 16) and when reaching a determination regarding Lindsey's RFC (Tr. 18, 19, 20).  Notwithstanding the

existence of new evidence, the ALJ concluded that there was no basis for finding greater

restrictions than those found by the prior ALJ. More particularly, the ALJ explained:

> The medical evidence does not show any substantial new evidence supporting
> limitations greater than what was previously found by the prior decision or the State
> agency medical consultants. The prior decision did not find peripheral neuropathy
> to be a severe physical impairment. However, despite such a finding in this
> decision, the physical exams of record did not indicate any weakness or limitations
> greater than what has already been determined (Exhibits B3F/3, 12, 19- 21; B8F/5;
> B15F/5).

Tr. 20.

Lindsey has not demonstrated that, as a result of her peripheral neuropathy, her condition

deteriorated such that a more restrictive RFC was required. Moreover, she has not shown that

the ALJ's findings are not supported by substantial evidence.

For example, on February 3, 2014, Dr. O'Malia saw Lindsey and completed a physical

examination. Tr. 405, 407. Lindsey complained of paresthesias mostly in her feet. Tr. 406.

However, on physical examination, Dr. O'Malia observed 5/5 strength in Lindsey's upper and

lower extremities and sensation to light touch was intact in all nerve distributions of bilateral

upper lower extremities. Tr. 407. There was no edema and peripheral pulses were intact in

Lindsey's extremities. Tr. 407. Dr. O'Malia indicated that diabetic neuropathy was likely the

cause of Lindsey's reported issues with her feet and indicated that a prescription for Gabapentin

should help. Tr. 408. A month later, on March 6, 2014, Dr. O'Malia saw Lindsey and Dr.

O'Malia's physical examination revealed no edema and peripheral pulses were intact in

Lindsey's extremities, Lindsey was able to bear weight on her hip without pain and able to bear

weight on her left knee without difficulty, and any pain and tenderness noted was mild. Tr. 398.

During an October 22, 2014, emergency room visit for chest pain, a physical examination

showed normal range of motion, no edema, and no tenderness. Tr. 692. Later, on August 20,

2015, Lindsey saw Dr. O'Malia again for follow up regarding a TIA and migraine.  Tr. 859.   On

physical examination, Dr. O'Malia observed some decreased sensation on the left extremities as

compared to the right but strength was 5/5 in the upper and lower extremities bilaterally.  Tr.

863.  There was no edema and peripheral pulses were intact in Lindsey's extremities.  Tr. 863.

Based on the foregoing, the undersigned recommends that the Court find no error with

respect to the ALJ's application of *Drummond*.

### 2.  Reversal is not warranted based on the ALJ's Step Two findings

Lindsey also argues that reversal is warranted because the ALJ did not properly evaluate

her impairments at Step Two.

At Step Two, a claimant must show that she suffers from a severe medically determinable

physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509,[9] or

a combination of impairments that is severe and meets the duration requirement.  20 C.F.R. §

404.1520(a)(4)(ii).  It is Lindsey's burden to show the severity of her impairments.  *Foster v.

Sec'y of Health & Human Svcs.,* 899 F.2d 1221, *2 (6th Cir. 1990) (unpublished) (citing *Murphy

v. Sec'y of Health & Human Svcs.*, 801 F.2d 182, 185 (6th Cir. 1986).  An impairment is not

considered severe when it does not significantly limit the claimant's physical or mental ability to

do basic work activities (without considering the claimant's age, education, or work

experience).[10]  *Long v. Apfel*, 1 Fed. Appx. 326, 330-332 (6th Cir. 2001); 20 C.F.R § 416.922(a).

---

[9] The duration requirement provides that "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."  20 C.F.R. § 404.1509.

[10] Basic work activities are defined by the regulations as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1522(b).  Examples, include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) the capacity to see, hear and speak; (3) the ability to understand, carry out, and remember simple instructions; (4) use of judgment; (5) ability to respond appropriately to supervision, co-workers, and usual work situations; and (6) the ability to deal with changes in a routine work setting.  *Id.*

The Sixth Circuit has construed Step Two as a *de minimis* hurdle such that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). However, as noted by the *Higgs* court, a diagnosis alone "says nothing about the severity of the condition." *Id.* at 863.

Additionally, where an ALJ finds one severe impairment and continues with subsequent steps in the sequential evaluation process, error, if any, at Step Two may not warrant reversal. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the Commissioner's failure to find claimant's cervical condition severe was not reversible error because the Commissioner did find a severe impairment and continued with the remaining steps in the sequential evaluation process)*; see also Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008) (relying on *Maziarz* when finding that, because the ALJ had found other impairments severe, the fact that some impairments were found to be non-severe at Step Two was not reversible error).

Lindsey contends that the ALJ disregarded medical evidence showing additional severe impairments of weakness in her left shoulder, weakness in her left hip, major depression, and migraine with aura and totally ignored other severe impairments of post-traumatic stress disorder, agoraphobia and a stroke in August 2015. Doc. 12, p. 17. While the ALJ did not find the foregoing impairments to be severe, the ALJ did not fail to consider these alleged impairments. Tr. 15-16 (discussing weakness in left shoulder; hip pain; diagnosis of depression, migraine with aura, which was described as more strokelike than migrainous); Tr. 18-20 (discussing Lindsey's allegations of agoraphobia, depressive, anxiety, diabetic neuropathy, bone

spur in left hip, back and neck pain, memory loss, left shoulder and left elbow tendinitis, diabetes, blood blots, and spinal injury).

Further, contrary to Lindsey's claim, the ALJ did not discount alleged <u>shoulder pain, hip pain, and stroke</u> based on there being no record of these impairments prior to her date last insured. The ALJ discounted <u>only</u> her left shoulder/elbow tendinitis pain for this reason. Tr. 16. Also, while the ALJ concluded that left shoulder/elbow tendinitis pain was not a medically determinable impairment, Lindsey has not shown that the ALJ failed to consider her allegations regarding this pain (*see e.g.,* Tr. 18) nor has she shown that evidence supports greater RFC limitations based on these alleged impairments.

Furthermore, while Lindsey may have been diagnosed with certain impairments that the ALJ did not find to be severe, e.g., depression, agoraphobia, and a stroke in August 2015, a diagnosis alone "says nothing about the severity of the condition[,]" *Higgs*, 880 F.2d at 863, and Lindsey has failed to demonstrate that the ALJ failed to consider evidence regarding impairments that were determined not to be severe.

Since the ALJ found other impairments to be severe, continued with the remaining steps and the sequential evaluation process, and considered both severe and non-severe impairments when assessing Lindsey's RFC, the undersigned recommends that the Court find no basis for reversal and remand based on the ALJ's Step Two determination.

### 3. The ALJ did not err in his evaluation of the physical therapist's opinion

Lindsey argues the ALJ erred in assigning no weight to the Functional Capacity Evaluation completed by physical therapist Jennifer Diehl. She contends that, even though Ms. Diehl is not an acceptable medical source, pursuant to Social Security Ruling 06-03p, the ALJ was nevertheless required to evaluate her opinion.

The undersigned finds no error with respect to the ALJ's consideration of Ms. Diehl's opinion. The ALJ evaluated Ms. Diehl's opinion and explained his reasons for assigning no weight to the opinion. More particularly, the ALJ stated:

> Jennifer Diehl, a physical therapist, provided a functional evaluation report completed on February 24, 2014, indicating that the claimant demonstrated the ability to work in the sedentary Dictionary of Occupational Titles (DOT) category (Exhibits B3F/67-68; B5F/47-48). The testing results showed the claimant unable to perform any lifting, pushing, or pulling at the frequent to constant level, with occasional postural limitations. Ms. Diehl reported that the claimant must avoid ladder climbing, kneeling, crawling, or crouching, and that the claimant tested at around 3+ to 4+ strength through the upper and lower extremities (Exhibit B3F/69). Because a physical therapist is not an acceptable medical source who can provide medical opinions as defined by our Regulations, the undersigned has considered the opinion evidence of Ms. Diehl as that of an "other source" (20 CFR 404.1513(a) and (d) and 416.913(a) and (d); SSR 06-03p). The undersigned accords no weight to this opinion. It is inconsistent with the objective medical evidence of record, including physical exams from treating medical sources that showed normal range of motion and strength through the extremities (Exhibits B3F/3, 12, 19-21; B8F/5; B15F/5).

Lindsey argues that, in reaching his conclusion that Ms. Diehl's opinion is inconsistent with objective medical evidence of record, the ALJ failed to cite to other evidence in the record that showed decreased strength, paresthesia, numbness, tingling, weakness, decreased sensation and absent ankle reflexes. However, an ALJ is not required to discuss every piece of evidence in his written decision. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 507-508 (6th Cir. 2006). Additionally, the ALJ did discuss evidence of decreased grip strength on left (Tr. 19 (citing Exhibit B7F/4 (Tr. 642)) and paresthesia in her arms (Tr. 19 (citing Exhibit B3F/10-11 (Tr. 406-406)). Further, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Here, Lindsey has not shown that the ALJ's decision to assign no weight to Ms. Diehl's opinion is not supported by substantial evidence. Moreover, while Lindsey disagrees

with the ALJ's weighing of Ms. Diehl's opinion, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.

Based on the foregoing, the undersigned recommends that the Court find no error with respect to the ALJ's consideration of and weighing of Ms. Diehl's opinion.

### 4. The ALJ did not err in assessing Lindsey's credibility

Lindsey contends that the ALJ's credibility assessment was insufficient.

Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996) ("SSR 96-7p").[11] "An ALJ's findings based on the credibility of the applicant are to be accorded

---

[11] SSR 16-3p, with an effective date of March 28, 2016, superseded SSR 96-7p. 2016 WL 1119029 (March 16, 2016); 2016 WL 1237954 (March 24, 2016).

great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

The ALJ's credibility assessment is far from flawed. The ALJ provided a detailed explanation of his reasons for finding Lindsey's allegations regarding the intensity, persistence and limiting effects of her symptoms not entirely credible. Following the ALJ's discussion of medical records, the ALJ explained:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.
>
> Despite the claimant's anxiety, she testified that she is able to drive one to two times per week. Moreover, she testified that she only takes over-the-counter Tylenol Extra Strength three to four times per day for her back pain because her doctor does not believe in prescribing her any pain medication. This is inconsistent with the allegations of debilitating body pain and limited physical abilities.
>
> Additionally, there is evidence that the claimant has not been entirely compliant in taking prescribed medications or following other treatment recommendations. Physical therapy notes indicated that the claimant was discharged on April 26, 2014 (Exhibit B5F/4). The note stated that most goals were not tested due to the unexpected discharge caused by the claimant's non-compliance. She received nine therapy sessions with two no shows. The claimant reported that she stopped taking medications due to side effects and, on August 27, 2014, she reported that she stopped taking all of her medications for a short time, including her insulin (Exhibit B9F/9-10, 14). She was not taking her Neurontin as prescribed for her neck pain (Exhibit 7F/32). She stopped other psychotropic medications in March 2015 (Exhibit Bl0F/30). In August 2014, the claimant continued to skip her Lantus at nighttime "fairly frequently," despite her doctor advising her not to skip it (Exhibit B15F/ l). This demonstrates a possible unwillingness to do that which is necessary to improve her condition. It may also be an indication that her symptoms are not as severe as she purports.

Tr. 20-21.

Lindsey does not contend that the ALJ's reasons for discounting her credibility are unsupported by the record. Rather, she contends that the ALJ's analysis is flawed because the ALJ ignored or gave little weight to her own subjective statements regarding the effects of her impairments on her functional abilities. Lindsey's argument is circular. The ALJ considered Lindsey's subjective statements (Tr. 18-19 (detailing Lindsey's subjective allegations) and found them not entirely credible based on the above detailed analysis (Tr.20-21).

Having reviewed the ALJ's decision, and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the undersigned recommends that the Court find no error with respect to the ALJ's assessment of Lindsey's credibility.

### 5. The ALJ's Step Five finding is supported by substantial evidence

Lindsey argues that the ALJ did not meet his burden at Step Five. This final argument is premised upon her contention that the ALJ's RFC finding is unsupported by substantial evidence. She contends that the ALJ should have relied upon a VE hypothetical question that described a reduced range of sedentary, as opposed to light, work. Further, she takes issue with jobs that the VE identified in response to an alternate sedentary hypothetical that was mirrored off of Ms. Diehl's Functional Capacity Evaluation.

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

For the reasons discussed herein, the undersigned finds no error with respect to the ALJ's RFC assessment and/or the ALJ's analysis of Ms. Diehl's opinion. Furthermore, Lindsey has not shown that the VE response upon which the ALJ relied to support his Step Five determination was given in response to a hypothetical question that did not accurately portray the limitations that the ALJ found credible. Thus, the VE's testimony constitutes substantial evidence upon which the Commissioner was entitled to rely to support the finding of no disability. *See Parks, supra.*

Accordingly, the undersigned recommends that the Court reject Lindsey's Step Five argument and find that the ALJ's Step Five determination is supported by substantial evidence.

### VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

September 21, 2017

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).